UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

| | |
|---|---|
| **HARVEST OIL & GAS, LLC** <br> TAX ID NO.  xx-xxxx3003 | **CASE NO. 15-50748** |
| **SARATOGA RESOURCES, INC.** <br> TAX ID NO.  xxxxxx4894 | **CASE NO. 15-50749** |
| **THE HARVEST GROUP LLC** <br> TAX ID NO.  xx-xxxx3158 | **CASE NO. 15-50750** |
| **LOBO OPERATING, INC.** <br> TAX ID NO.  xxxxxx9904 | **CASE NO. 15-50751** |
| **LOBO RESOURCES, INC.** <br> TAX ID NO.  xxxxxx7201 | **CASE NO. 15-50752** |
| **DEBTORS** | (JOINT ADMINISTRATION REQUESTED) |

**DEBTORS' EMERGENCY MOTION FOR ORDER UNDER FED. R. BANKR. P. 1015(b)
DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES**

**NOW INTO COURT**, through undersigned counsel, comes, Harvest Oil & Gas, LLC ("Harvest Oil"), Saratoga Resources, Inc. ("Saratoga"), The Harvest Group LLC ("Harvest Group," and together with Harvest Oil, the "Harvest Companies"), Lobo Operating, Inc. ("Lobo Operating"), and Lobo Resources, Inc. ("Lobo Resources" and together with Lobo Operating, the "Lobo Companies"), each a debtor and debtor-in-possession (Saratoga, Harvest Oil, Harvest Group, Lobo Operating, and Lobo Resources, individually referred to herein as a "Debtor" and collectively referred to herein as the "Debtors"), and file the *Debtors' Emergency Motion for Order Under Fed.R.Bankr.P. 1015(b) Directing Joint Administration of Chapter 11 Cases* and in support thereof would respectfully show unto the Court the following:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over these cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M) and (0).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The authority for the relief requested herein is Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and section 105(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code").

## II. BACKGROUND

4. On June 18, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code.

5. The Debtors remain in possession of their property and are managing their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6. No trustee has been appointed and no official committee has been established in these cases.

### A. 2009 Chapter 11 Filing

7. In order to preserve the companies' equity, on March 31, 2009, the Debtors each filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code, Case Nos. 09-50397 through 09-50401 ("2009 Bankruptcy").

8. On April 19, 2010, this Court entered an order [ECF No. 1101, 09-50397] (the "Confirmation Order") [ECF No. 1101, 09-50397] confirming the *Debtors' Third Amended Plan of Reorganization (as Modified as of March 31, 2010)* [ECF No. 1074, 09-50397] (the "2010

Plan"). On May 14, 2010 (the "Effective Date"), the Debtors filed a notice of the occurrence of the Effective Date with the Bankruptcy Court [ECF No. 1129, 09-50397] and the 2010 Plan became effective and was substantially consummated.

### B. Emerging from 2009 Bankruptcy

9. On the Effective Date, the Debtors emerged from chapter 11. The Debtors and Wayzata, as administrative agent for various lenders, entered into a First Amendment to Amended and Restated Credit Agreement ("Amended Wayzata Credit Agreement") which, among other things, amended the Revolving Credit Agreement.

10. The Amended Wayzata Credit Agreement fixed the amount owing at $127.5 million, limited acceptable commodity hedging agreements to 60% of projected monthly production, reduced the interest rate of loans to 11.25%, and extended the maturity date of the loans to April 30, 2012.

11. Under the 2010 Plan, (1) warrants (the "Warrants") to purchase up to 2,000,000 shares of common stock were issued to Wayzata and (2) 483,310 shares of newly issued common stock, par value $0.001 per share ("Common Stock"), were distributed pro rata among the holders of allowed oil lien creditor claims, other secured claims and unsecured claims. The Warrants were exercisable at $0.01 per share, vested and became exercisable 111,111 shares on the Effective Date and 111,111 shares per month over the following seventeen months unless all amounts payable under the Amended Wayzata Credit Agreement were paid in full, in which case any unvested portion of the warrant on the date of repayment in full would be forfeited, and expired May 14, 2015. The issuance of the Warrants and the Common Stock pursuant to the 2010 Plan was exempt from registration under the Securities Act of 1933, as amended, pursuant to Section 1145 of the Bankruptcy Code.

12.     Saratoga emerged from its 2009 Bankruptcy in May 2010, having retained all of its assets and preserved approximately 100% of its equity for its equity holders, and having paid all vendors, both secured and unsecured, 100% of their claims plus interest and legal expenses. During the 2009 Bankruptcy, Saratoga funded its operations and bankruptcy-related expenses entirely from cash flows, accumulating approximately $24 million in cash, while paying approximately $12 million in bankruptcy related expenses, and invested $6 to $7 million to maintain production at existing levels. Ultimately, Saratoga's ability to pay its creditors in full while retaining its assets and shareholder value and maintain production levels is a testament to the quality of the assets and the company's ability to produce consistent strong cash flow, as well as its keen emphasis on controlling costs and prudently investing capital.

**C.    Saratoga Operations Post- 2009 Bankruptcy**

13.     Since emerging from the 2009 Bankruptcy, Saratoga successfully resumed full operations, including reinstituting and accelerating its development program and investing in numerous infrastructure and maintenance projects that were temporarily deferred due to limited funding during and immediately following the 2009 Bankruptcy.

**(1)    2011 Equity Placements**

14.     After the conclusion of the 2009 Bankruptcies, Saratoga successfully closed two private placements of equity securities (the "2011 Equity Placements") raising approximately $34.7 million during 2011. The first private placement raised $7.4 million from the sale of units comprised of two shares of common stock and one warrant offered at $6.00 per unit. A total of 2,481,316 shares of common stock and 1,240,658 warrants were sold in the private placement to U.S. and non-U.S. accredited investors. The warrants included in the placement were exercisable for two years to purchase shares of common stock at $5.00 per share. The second private

placement raised $27.3 million from the sale 5,650,000 shares of common stock at $5.00 per share.

**(2) 12½% Second Lien Notes**

15. In July 2011, the Debtors entered into a Purchase Agreement with Imperial Capital, LLC (the "Imperial Capital"), relating to the issuance and sale of $127.5 million in aggregate principal amount of 12½% Senior Secured Notes due 2016 ("Second Lien Notes").[1] Imperial Capital, in turn, resold the Second Lien Notes to qualified institutional buyers in reliance on Rule 144A of the Securities Act of 1933 (the "1933 Act") and to persons outside of the U.S. pursuant to Regulation S under the 1933 Act. The proceeds from this offering, together with a portion of the proceeds from the 2011 Equity Placements, were used to pay in full the outstanding indebtedness under the Amended Wayzata Credit Agreement. As a consequence of the payment and discharge of the Amended Wayzata Credit Agreement, the obligations of the Companies due at the time of the 2009 Bankruptcies have been paid in full.

16. In December 2012, the Debtors entered into another Purchase Agreement with Imperial Capital, relating to the issuance and sale of an additional $25 million in aggregate principal amount of the Second Lien Notes. Imperial Capital again resold the additional Second Lien Notes acquired under that Purchase Agreement to qualified institutional buyers and persons outside of the U.S. Net proceeds from the offering were used for general working capital and capital expenditures.

17. The Second Lien Notes were issued pursuant to the Second Lien Indenture (as defined herein) among the Debtors and Second Lien Trustee (as defined herein), as trustee and collateral agent and, with respect to the Second Lien Notes issued in 2012, a First Supplemental Indenture, dated December 4, 2012. The Second Lien Notes are the senior secured obligations of

---

[1] The holders of the Second Lien Notes shall be referred to as the "Second Lien Noteholders".

Saratoga and are fully and unconditionally guaranteed on a senior secured basis by the subsidiaries and will rank equally in right of payment with the Debtors' existing and future senior indebtedness, subject, however, to the Intercreditor Agreement pursuant to which the First Lien Notes (as defined herein) are senior in right, priority, operation and effect to the lien securing the Second Lien Notes.

18. The Second Lien Notes mature on July 1, 2016, and interest under the notes is payable on January 1 and July 1 of each year.

19. The Second Lien Indenture includes customary events of default and places restrictions on the Debtors with respect to additional indebtedness, liens, dividends and other payments to shareholders, repurchases or redemptions of Saratoga's common stock, redemptions of senior notes, investments, acquisitions, mergers, asset dispositions, transactions with affiliates, hedging transactions and other matters.

### (3) NYSE Listing

20. On July 20, 2011, Saratoga's common stock was approved for listing on the NYSE Amex (subsequently became NYSE MKT) stock exchange with its common stock beginning trading on the exchange under the trading symbol 'SARA.'

### (4) 2012 Equity Issuances

21. In May 2012, Saratoga closed a private placement of common stock at $6.25 per share, raising approximately $18.5 million, net of expenses, from the sale of 3,089,360 shares to select institutional and accredited investors. In a separate transaction, also in May 2012, Saratoga received $1.07 million of proceeds from the exercise of outstanding warrants, at $5.00 per share, resulting in the issuance of 213,996 shares of common stock.

**(5) 10.0% First Lien Notes**

22. In November 2013, the Debtors issued $54.6 million in aggregate principal amount of 10.0% Senior Secured Notes due 2015 (the "First Lien Notes") to two institutional accredited investors (the "Purchasers").[2] The First Lien Notes were issued pursuant to Purchase Agreements (the "Purchase Agreement"), and under an Indenture (the "First Lien Indenture"), by and among the Debtors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "First Lien Trustee"). The First Lien Notes are senior secured obligations and are fully and unconditionally guaranteed (the "Guarantees") on a senior secured basis by the subsidiaries and will rank equally in right of payment with the Debtors' existing and future senior indebtedness and senior in right of payment to Second Lien Notes.

23. The purchase price for the First Lien Notes and Guarantees was 100% of their principal amount. Saratoga received net proceeds from the issuance and sale of the First Lien Notes of approximately $25.4 million, after commissions and estimated offering expenses, and the surrender for retirement by the Purchasers of $27.3 million in face amount of Second Lien Notes.

24. The First Lien Notes mature on December 31, 2015, and interest, accruing at 10% per annum, is payable under the First Lien Notes on March 31, June 30, September 30 and December 31 of each year, commencing December 31, 2013.

25. The First Lien Indenture includes customary events of default and places restrictions on the Debtors with respect to additional indebtedness, liens, dividends and other payments to shareholders, repurchases or redemptions of Saratoga's common stock, redemptions of senior notes, investments, acquisitions, mergers, asset dispositions, transactions with affiliates, hedging transactions and other matters.

---

[2] The holders of the First Lien Notes shall be referred to as the "First Lien Noteholders".

26. In connection with the issuance and sale of the First Lien Notes, the Debtors, the First Lien Trustee and The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee and collateral under the Second Lien Indenture (as defined below) (the "Second Lien Trustee")[3] entered into an Intercreditor Agreement (the "Intercreditor Agreement"). Pursuant to the Intercreditor Agreement, the parties thereto agreed that the lien with respect to collateral securing the First Lien Indenture and related First Lien Notes and Guarantees (the "First Lien Obligations") shall be senior in right, priority, operation, effect and all other respects to any lien with respect to collateral securing the obligations under that certain Indenture dated as of June 12, 2011, as supplemented or amended from time to time thereafter (the "Second Lien Indenture"), by and among the Debtors and the Second Lien Trustee, and the related Second Lien Notes in the aggregate amount of $125.2 million (the "Second Lien Obligations").

27. At the present time, the First Lien Obligations are held 100% by Blackstone / GSO Capital Solutions Overseas Master Fund L.P., Blackstone / GSO Capital Solutions Fund LP and Stonehill Capital Management, LLC (the "Majority Noteholders"). Based on representations by the Majority Noteholders, the Majority Noteholders also hold or manage at least 75% of the Second Lien Notes. Accordingly, as of the Petition Date, the Company believes that the Majority Noteholders are owed 100% of the First Lien Notes in the amount of approximately $54.6 million and are owed about 75% of the Second Lien Notes in the approximate amount of $97.6 million. The remainder of the Second Lien Notes, in the approximate amount of $27.6 million, is held by approximately 20 financial institutions or funds.

---

3 The Bank of New York Mellon Trust Company, N.A. is the First Lien Trustee and the Second Lien Trustee.

### D. Overview of Saratoga's Current Assets and Operations

28. The Debtors are a grouping of independent exploration and production companies, owners and operators (along with a holding company), focused on acquisition, development and production of natural gas and crude oil properties. Principal holdings cover approximately 52,000 gross/net acres, more than half of which are held by production without near-term lease expirations, comprised of principal producing properties covering approximately 32,000 acres in the transitional coastline and protected in-bay environment on parish and state leases of south Louisiana, and approximately 20,000 acres of leases in the shallow Gulf of Mexico shelf.

29. The Debtors operate, or have interests in, 105 producing wells across 11 fields in the transitional coastline and protected in-bay environment on parish and state leases in south Louisiana, as well as in shallow waters of the Gulf of Mexico. The Debtors own approximately 100% working interest in substantially all of their properties with net revenue interests ranging from 70% to 82% and averaging, on a net acreage leasehold basis, approximately 75%. As operators of over 99% of the wells that comprise the Debtors' PV-10 value, the Debtors exercise management control of operating costs, capital expenditures and the timing and method of development of properties.

30. The Debtors' properties are characterized by multiple stacked reservoir objectives with a large drilling inventory ranging from as shallow as 1,000 feet to the ultra-deep prospects below 20,000 feet, in water depths ranging from less than 10 feet to a maximum of approximately 80 feet. The properties provide Saratoga with a valuable reserve base, an extensive portfolio of behind pipe potential, and lower-risk drilling opportunities and a proved reserve commodity mix that is 56% oil and 44% natural gas.

9
{00345295-5}

15-50749 - #3  File 06/19/15  Enter 06/19/15 09:45:48  Main Document  Pg 9 of 18

**(1) Drilling and Development Activities**

31. Saratoga has successfully drilled and completed 15 wells since 2008 with one unsuccessful well to date. Fourteen of these successful wells have occurred since emerging from Chapter 11 in May 2010.

32. In early 2013, the Debtors began investigating a new focus on the application of horizontal development drilling in its properties with initial emphasis on the Company's Breton Sound Block 32 field, in which three successful horizontal wells have been drilled and completed with the most recent of these having the highest production rate of any well in the field since 1949.

**(2) Field Operating Issues, Production Optimization and Cost Cutting Initiatives**

33. Calendar year 2014 presented challenges to the Debtors. The early part of 2014 presented challenges relating to the Debtors' field operations, while the latter part of 2014 presented challenges relating to commodity prices. Exhaustive initiatives undertaken in the field have remedied the field operating issues and an ongoing, cost containment program is bringing down operating costs to address the lower commodity price environment. Production optimization initiatives and infrastructure improvements undertaken throughout the year have addressed the principal causes of decreased run times, gas lift gas shortages, mechanical issues and flow line capacity constraints, raising run time and production rates to approximately 80% and 1,904 Boepd during the fourth quarter of 2014 from 54% and 1,330 Boepd during the first quarter of 2014.

34. In response to lower commodity prices, the Debtors have met this challenge by dramatically reducing lease operating expenses ("LOE") and general and administrative expenses ("G&A"). The LOE and G&A expenses for the first quarter of 2015 are approximately

10

27% and 20% lower, respectively, than the averages for the corresponding quarter in 2014. The Debtors expect annual savings of LOE and G&A of more than $13 million in the next twelve months compared to the previous year.

### (3) Collapse of Commodity Prices

35. Beginning in the third quarter of 2014 and accelerating late in 2014 and into early 2015, projected oil supplies outstripped projected oil demand on a global basis, reflecting a projected slowing in the global economy coupled with substantial new supplies of oil, particularly from U.S. shale resources, as well as production coming back on line in Libya and Iran. The Debtors realized prices from oil sales dropped to near six-year lows from an average of $102.93 per barrel of crude oil and $5.90 per thousand cubic feet ("MCF") of natural gas in the first quarter of 2014, to an average of $45.72 per barrel of crude oil and $3.29 per MCF in the first quarter of 2015, 55% and 44% lower, respectively, than in prior quarters. Crude oil prices have subsequently recovered to over $60.00 per barrel offset by natural gas prices below $3.00 per MCF during the second quarter of 2015

### (4) Drilling and Development Plans

36. The Debtors have an extensive inventory of drilling opportunities, including numerous proved developed non-producing ("PDNP") and proved undeveloped ("PUD") opportunities, as well as a number of exploratory opportunities. In light of the recent decline in oil prices, the Debtors have temporarily shelved all joint venture marketing efforts and development drilling and are focused on recompletions, workovers and conversion of PDNP opportunities supported by cash on hand and cash flow with projected cash available from LOE and G&A savings.

**(5) Reserves**

37. The Debtors' year-end 2014 proved reserves, 100% of which have been audited pursuant to the standards of the Society of Petroleum Engineers ("SPE"), are 5,793 MBO plus 26,601 MMCF, or 10,227 MBOE with PV10 of $209 million. Year-end 2014 reserves reflect production of 670.0 MBOE during 2014 and the reclassification during the past two years of 10,225 MBOE of reserves, with PV10 of $197 million, out of the PUD category to the probable category pursuant to the Securities and Exchange Commission ("SEC") "5-year rule" wherein reserves cannot be maintained in the PUD category for more than 5 years. The reclassified reserves in question are associated with "held by production" ("HBP") acreage and may at a future date be reclassified to the proved category. There has been no change in the nature and quality of the assets, and the reclassification is not due to negative economics. Two thirds of the reserves in question are gas and were given a lower priority for development by the Debtors than were other projects due to more favorable oil pricing.

38. The Debtors' third-party, year-end 2014 proved plus probable plus possible reserves ("3P"), 100% of which have been audited pursuant to SPE standards, are 32,969 MBO plus 241,837 MMCF, or 73,275 MBOE, with PV10 of $1.4 billion.

39. The aforementioned reserves were computed based upon SEC pricing of $94.99 per barrel and $4.35 per MCF, without basis differentials, on December 31, 2014. When 2014 production of 512 MBO and 950 MMCF, or 670 MBOE, is accounted for, Saratoga added a net 436 MBO and 6,285 MMCF of proved reserves in 2014 (excluding reserves reclassified out of the PUD category and into the Probable category pursuant to the "5-year rule").

40. Further proved reserves have subsequently been booked during 2015 as a result of field studies at the Debtors' Breton Sound Block 32 and Main Pass Block 25 fields.

41. The Debtors also have considerable hydrocarbon potential associated with shallow gas and ultra-deep gas located in the vicinity of existing infrastructure and under HBP acreage. Although resource assessments for this potential are preliminary and unaudited, such potential could add significant value to the Debtors in the near future.

### E. Events Leading to Bankruptcy and Need for Relief

42. The sudden and precipitous collapse in global crude oil prices, coupled with lagging natural gas prices, in the latter part of 2014 led to significantly lower cash flow for the Debtors with realized crude oil and gas prices from sales dropping by 55% and 46% respectively between the third and fourth quarters of 2014.

43. As of year-end 2014 the Debtors had sufficient cash to make interest payments on their first lien debt, but given the drastic drop in prices and the inability of the market to project future prices with clarity, the Debtors entered into forbearance agreements in January 2015 with their first and second lien lenders, which forbearance agreements specifically contemplated the payment of interest on the first lien notes for the fourth quarter of 2014 and the non-payment of interest on the second lien debt. These forbearance agreements have been extended by and with consent of the parties several times.

44. The Debtors are in serious negotiations to achieve a consensual resolution with the majority note holders and have taken several steps requested by the Majority Noteholders, including the appointment of a Financial Advisor, creation of an Independent Restructuring Committee, appointment of an additional independent director, weekly financial reporting and frequent updates on discussions with third parties, bonding, insurance and legal matters.

45. While the Debtors were in negotiations with the Majority Noteholders to achieve a possible out of court restructuring, Harvest Operating LLC[4] obtained a judgment arising as a result of an arbitration award against Saratoga, and the Harvest Companies. The arbitration proceedings addressed two separate disputes—(1) the "Royalty Dispute" between Saratoga and Mr. Brian Albrecht, individually, and (2) the "Pipeline Use Dispute" between Harvest Operating and Saratoga and its Harvest entities. The claims were consolidated for purposes of the arbitration hearing. In the Royalty Dispute, Saratoga prevailed against Harvest Operating for its failure to have paid the State the required oil and gas royalties on properties sold to Saratoga by the predecessor entity to Harvest Operating. Saratoga was awarded $355,879.15 on August 18, 2014, with interest accruing at the judicial rate of interest, 4.00% per annum. The Pipeline Use Dispute arose from a lawsuit filed by Harvest Operating in which it sought damages for Saratoga's alleged breach of an agreement. On August 18, 2014, the arbitrator awarded $3,757,050.00, with interest accruing at the judicial rate of interest, 4.00% per annum, in favor of Harvest Operating. Thus, the net of the two awards totals approximately $3,401,170.85, plus interest (at the judicial rate) from August 18, 2014. On May 8, 2015, Judge Caldwell of the 19th JDC confirmed the arbitration awards and entered judgment (the "Albrecht Judgment"). The deadline by which to file a suspensive appeal is Thursday, June 19, 2015, so arguably the arbitration award becomes executory June 19, 2015.

46. Saratoga has also filed an action, captioned *Saratoga Resources, Inc. v. Brian Albrecht*, 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, No. 744-327, Section L, claiming that if in fact Harvest Operating was entitled to the use of the pipeline as decided in arbitration, which was contested, then Harvest Operating failed to disclose this contract, which was material to the Purchase Sale Agreement ("PSA") through which the

---

4 Harvest Operating is a non-related entity to the Debtors and is controlled by Brian Albrecht.

membership interest of the Harvest LLC's--and therefore the ownership rights in the pipeline--were sold to Saratoga. However, because Harvest Operating maintained a position regarding its pipeline use that infringes substantially on Saratoga's ownership rights and because that right was not disclosed as required under the PSA, Harvest Operating and Mr. Albrecht are liable to Saratoga for damages. This litigation is pending and discovery is just beginning. Saratoga intends on vigorously pursuing its suit.

47. Unfortunately, the Debtors' lawsuit is not as far along as the Albrecht Judgment, and accordingly, the Debtors are exposed to collection activity on the Albrecht Judgment while its own suit is pending and not yet available as an offset to the Albrecht Judgment. Efforts to settle the Albrecht Judgment have been unsuccessful and the Debtors (and the Majority Noteholders) believed that it was appropriate for the Debtors to protect their assets and continuity of operations from collection action on account of the Albrecht Judgment until it could conclude its own lawsuit against Albrecht, and continue efforts to restructure its obligations under the first and second lien notes and use the bankruptcy process to implement any such consensual (or nonconsensual) restructuring.

48. The Debtors filed for Chapter 11 relief under the Bankruptcy Code in an effort to maximize the value of the estates for all constituents, including unsecured creditors and equity interest holders. The Debtors hope to reach a consensual resolution with their creditors and equity holders to restructure their debt and capital structure.

### III. REQUESTED RELIEF AND BASIS FOR RELIEF

49. The Debtors seek orders directing the joint administration of their chapter 11 cases for procedural purposes only.

50. Rule 1015(b) of the Federal Rules Bankruptcy Procedure provide, in relevant part:

15

> If a joint petition or two or more petitions are pending in the same court or against....a debtor and an affiliate, the court may order a joint administration of the estates.

Fed.R.Bank.P. 1015(b)

51. It is also customary in this district and required by the local rules in other districts that if the Court authorizes joint administration, the number of the lowest numbered bankruptcy case is to be captioned first and the caption of the lowest numbered case is to serve as the identifying caption. In order to optimally and economically administer these pending chapter 11 cases, these chapter 11 cases should be jointly administered, for procedural purposes only, under the case number assigned. *See In re Harvest Oil & Gas, LLC*, 09-50397 (order entered 04/08/2009); *In re Louisiana Riverboat Gaming Partnership*, 08-10824 (order entered March 12, 2008); and *In re: Communications Corporation of America*, 06-50410 (order entered June 7, 2006).

52. The Debtors submit that joint administration of their cases will obviate the need for duplicative notices, motions, applications and orders, and thereby save considerable time and expense for the Debtors and their estates.

53. The rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these cases because this Motion requests only administrative consolidation of the estates, and the Debtors are not by this Motion seeking substantive consolidation. Notwithstanding the entry of an order granting the relief requested by this Motion, each creditor shall file a proof of claim against a particular Debtor's estate. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration. This Court also will be relieved of the burden of entering duplicative orders and maintaining

16

{00345295-5}

15-50749 - #3  File 06/19/15  Enter 06/19/15 09:45:48  Main Document  Pg 16 of 18

duplicative files. Finally, supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will be simplified.

54. By reason of the foregoing, the interests of the Debtors, their creditors and equity security holders, and all parties in interest would be best served by joint administration of the above-captioned cases. Accordingly, the Debtors request that the caption of their cases be modified to reflect the joint administration of the chapter 11 cases, as follows:

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| IN RE | : | CASE NO. 15-50748 |
|---|---|---|
|  | : |  |
| **HARVEST OIL & GAS, LLC,** *ET AL*[1] | : | **CHAPTER 11** |
|  | : |  |
| **DEBTORS.** | : | **JOINTLY ADMINISTERED** |

55. The Debtors further request that: (a) a single docket sheet shall be maintained for all matters occurring in these cases, however, separate claims registers shall be maintained and each creditor shall file a proof of claim against a particular Debtors' estate; (b) a combined service list shall be used; and (c) combined notices to creditors of the estates shall be used.

### V. NOTICE

56. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Debtors and their counsel; (iii) any party whose interests are directly affected by a specific pleading; (iv) those persons who have formally appeared and requested notice and service in this proceeding pursuant to Bankruptcy Rules 2002 and 3017; (v) counsel for and the members of any official committees appointed by this Court; (vi) The Bank of New York

---

[1] Saratoga Resources, Inc. (15-50749); The Harvest Group LLC (15-50750); LOBO Operating, Inc. (15-70751); and LOBO Resources, Inc. (15-50752) are being jointly administered with Harvest Oil & Gas, LLC (15-50748) pursuant to a court order [P-___] entered on _____, 2015

17

{00345295-5}

Mellon Trust Company, N.A. (as administrative agent on behalf of the First Lien Noteholders) through their counsel; (vii) The Bank of New York Mellon Trust Company, N.A. (as administrative agent on behalf of Second Lien Noteholders) through their counsel; (viii) the Majority Noteholders through their counsel; (ix) the twenty (20) largest unsecured creditors of the Debtors on a consolidated basis; (x) the Securities and Exchange Commission, and (xi) governmental agencies having a regulatory or statutory interest in these cases.

**WHEREFORE**, each of the Debtors respectfully pray that this Court enter an order, substantially in the form submitted herewith, (a) authorizing the joint administration of Harvest Oil & Gas, LLC chapter 11 case with the chapter 11 cases of each of the other Debtors under the case number assigned to Harvest Oil & Gas, LLC; and (b) granting such other relief as the Court deems just and proper.

Dated: June 19, 2015.

                        Respectfully submitted,

                        */s/ Tristan E. Manthey*
                        William H. Patrick, III (La. Bar No. 10359)
                        Tristan E. Manthey, (La. Bar No. 24539)
                        Cherie Dessauer Nobles, (La. Bar No. 30476)
                        **Heller, Draper, Patrick, Horn & Dabney, L.L.C.**
                        650 Poydras Street, Suite 2500
                        New Orleans, Louisiana 70130-6175
                        Telephone: 504-299-3300
                        Facsimile: 504-299-3399
                        **Proposed Co-Counsel for Debtors**

                        Louis Phillips (La. Bar No. 10505)
                        **Gordon, Arata, McCollam, Duplantis & Eagan, LLC**
                        301 Main Street, Suite 1600
                        Baton Rouge, Louisiana 70801-1916
                        Telephone: 225-381-9643
                        Direct Phone: 225-338-5308
                        Facsimile: 225-336-9763
                        **Proposed Co-Counsel for Debtors**

18

{00345295-5}

15-50749 - #3   File 06/19/15   Enter 06/19/15 09:45:48   Main Document   Pg 18 of 18